| | |
|---|---|
| **SAYLER FARMS, LLC,**<br>     On behalf of itself and all other<br>     similarly situated persons and entities,<br><br>          **Plaintiff**<br><br> -vs.-<br><br>**SYNGENTA CROP PROTECTION, AG,**<br>**SYNGENTA CROP PROTECTION, LLC,**<br>**SYNGENTA CORP., and**<br>**CORTEVA, INC.,**<br><br>          **Defendants** | **CLASS ACTION COMPLAINT FOR**<br>**VIOLATION OF THE ANTITRUST**<br>**LAWS**<br><br><br>**CASE NO.: 1: 22-cv-1055**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sayler Farms, LLC ("Plaintiff") brings this action on behalf of itself and all other similarly situated persons and entities against Defendants Syngenta Crop Protection AG, Syngenta Crop Protection, LLC, and Syngenta Corp. (collectively, "Syngenta"), and Corteva, Inc. ("Corteva") (collectively, "Defendants"), including their unnamed co-conspirators, and alleges the following:

## NATURE OF THE ACTION

1.     This is a class action for violations of the United States antitrust laws. Defendants manufacture several crop protection products ("CPPs;" specifically, herbicides, insecticides, and fungicides) used by numerous American farmers, including Plaintiff. Defendants' CPPs and the active ingredients contained in them enjoy a period of patent protection and regulatory protection under which they are lawfully protected from competition. Once these protection periods expire, competing generic manufacturers are allowed to produce their own versions of the CPPs, which typically drastically reduces the price of the CPPs.

1

2.     Here, to maintain their market dominance after their patent and regulatory protection of their CPPs expired, Defendants, from January 1, 2017 to the present (the "Relevant Period" or "Class Period") have used (and continue to use) restrictive agreements disguised as "loyalty programs" with large agricultural products distributors and retailers (*i.e.*, the unnamed co-conspirators) to block the availability of CPPs to farmers containing lower-priced generic versions of the following active ingredients ("AIs"): Syngenta's MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR, and Corteva's OXAMYL, RIMSULFURON, and ACETOCHLOR (collectively, the "Relevant AIs"). Under these "loyalty programs," Defendants made substantial payments to distributors, and in certain cases, retailers, in exchange for the distributors' and retailers' agreement to strictly limit their purchases of – and thereby prevent widespread distribution of – generic versions of Defendants' CPPs containing the Relevant AIs, ensuring that Defendants' far more expensive brand-name CPPs would be the vast majority of what the distributors and retailers purchased and sold to their customers.

3.     Since a small number of major distributors control a very large share of the CPP sales to retailers that, in turn, sell the CPPs to farmers, and since some of the distributors also own their own retail outlets, when there is a loyalty program in effect for a certain CPP manufactured by Defendants containing the Relevant AIs, the generic CPP manufacturers are foreclosed from nearly all the retail market for such CPP. When there is a loyalty program in place for a particular CPP manufactured by Defendants containing the Relevant AIs, the generic CPP manufacturers can typically only sell much smaller volumes of such CPP, or often cannot sell it profitably at all— forcing them to exit the market or refrain from entering the market in the first place. The unnamed co-conspirator distributors and retailers listed below participated in these loyalty programs.

4.     Defendants' loyalty programs have negatively impacted the CPP market in the

following ways (and continue to do so): (i) Defendants are able to maintain a near-monopoly for the sales of each of their CPPs containing the Relevant AIs even though patent and regulatory protection have expired and there should be open competition from generic CPP manufacturers, (ii) Defendants are able to continue to charge much higher prices for their CPPs containing the Relevant AIs as a result of excluding most generic competition, generating supra-competitive profits, (iii) Defendants share a portion of their supra-competitive profits with their unnamed distributor and retailer co-conspirators to ensure their cooperation with this scheme, (iv) farmers pay much higher prices for CPPs containing the Relevant AIs than they otherwise would pay if there was free and open competition but for Defendants' wrongful conduct, and (v) generic CPPs containing the Relevant AIs are also priced higher than they would be priced if there was free and open competition but for Defendants' wrongful conduct.

5.      Defendants' anticompetitive scheme has reduced competition in the market for the CPPs containing the Relevant AIs, thereby artificially inflating the prices of such CPPs and of the CPPs manufactured by Defendants' generic competitors. Plaintiff and the Class member farmers who purchased CPPs containing the Relevant AIs have been (and continue to be) injured by paying artificially inflated prices for such CPPs—for which they are entitled to compensation.

6.      Plaintiff, on behalf of itself and Class members, seek treble damages and injunctive relief, demanding a trial by jury of all issues so triable, under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1-2), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

## JURISDICTION AND VENUE

7.      Plaintiff, on behalf of itself and Class members, brings this action under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to (i) secure damages for Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and (ii) recover treble damages, injunctive relief, litigation expenses, costs of suit, and reasonable attorneys' fees for

3

Plaintiff's and Class members' injuries, harm, and damages directly and/or proximately resulting from Defendants' above-described wrongful conduct.

8.      This Court has subject matter jurisdiction over Plaintiff's and Class members' claims under 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

9.      This Court has personal jurisdiction over each Defendant because each Defendant, throughout the United States, including in this District and the State of North Carolina, transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the above-described illegal scheme and conspiracy (and continues to do so). The alleged scheme and conspiracy were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, and/or doing business throughout the United States, including this District and the State of North Carolina.

10.      Defendants' and co-conspirators' above-described wrongful actions were (and continue to be) within the intended flow of commerce within the United States and had direct, substantial, and reasonably foreseeable effects on interstate commerce.

11.      Venue is proper in the Middle District of North Carolina under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. §§ 1391(b); (c); and (d), because during the Relevant Period, one or more Defendants resided, transacted business, were found, or had agents in the Middle District of North Carolina (and continue to do so), and a substantial portion of Defendants' alleged wrongful actions affecting interstate trade and commerce was carried out in this District.

12.      Defendants are amenable to service of process under Fed. R. Civ. P. 4(k)(1)(A) and/or the North Carolina long-arm statute because (i) each Defendant transacts and/or transacted

4

business in North Carolina, (ii) the North Carolina long-arm statute extends jurisdiction to the limits of Due Process, and (iii) each Defendant has sufficient minimum contacts with the state of North Carolina to satisfy Due Process.

## PARTIES

### I. Plaintiff.

13. Plaintiff Sayler Farms, LLC is a South Dakota limited-liability company based in Artas, South Dakota. Plaintiff Sayler Farms, LLC is a farming operation that purchased CPPs containing one or more of the Relevant AIs from unnamed co-conspirator Peterson Seeds, Inc., in Northville, South Dakota and/or its affiliates or agents during the Relevant Period, and suffered injury, harm, and damages to its business or property as a direct and/or proximate result of Defendants' above-described wrongful actions

### II. Defendants.

14. The term "Defendants" includes Defendants and all their predecessors, successors, and assigns, including entities merged with or acquired by any Defendant, and each Defendant's current or former parent companies and/or wholly owned or controlled subsidiaries or affiliates, that marketed and sold CPPs containing the Relevant AIs in interstate commerce in the United States, including the Middle District of North Carolina, during the Relevant Period.

15. Each Defendant marketed and sold CPPs containing the Relevant AIs and played a material role in the alleged anticompetitive behavior during the Relevant Period. All Defendants were active, knowing participants in the alleged anticompetitive behavior, and their conduct, to the extent committed by Defendants, was known to, and approved by, their parent companies, subsidiaries, and/or affiliates.

16. Defendant Syngenta Crop Protection AG is a Swiss public limited company based in Basel, Switzerland. China National Chemical Company (ChemChina) acquired Syngenta in

5

2017. Thereafter, in May 2021, ChemChina merged with Sinochem Group Co., Ltd. The merged company is a subsidiary of Sinochem Holdings Corporation Ltd., which is a state-owned Chinese company based in Beijing, China. Syngenta Crop Protection AG's North American headquarters is in Greensboro, North Carolina.

17. Defendant Syngenta Crop Protection, LLC, an affiliate of Defendant Syngenta Crop Protection AG, is a Delaware limited liability company based in Greensboro, North Carolina.

18. Defendant Syngenta Corp., an affiliate of Defendant Syngenta Crop Protection AG, is a Delaware corporation based in Wilmington, Delaware.

19. During the Relevant Period, Defendants Syngenta Crop Protection AG, Syngenta Crop Protection, LLC, and Syngenta Corp. (collectively, "Syngenta") transacted substantial business in the Middle District of North Carolina, including the research, development, manufacture, sale, and marketing of CPPs containing the Relevant AIs.

20. Defendant Corteva, Inc. is a Delaware corporation based in Indianapolis, Indiana. Defendant Corteva, Inc. was formed in 2017 when Dow Chemical and DuPont merged to form DowDuPont. In 2019, DowDuPont spun off its agricultural business, including CPP manufacturing, into Defendant Corteva, Inc. During the Relevant Period, Defendant Corteva, Inc. transacted substantial business in the Middle District of North Carolina, including the research, development, manufacture, sale, and marketing of CPPs containing the Relevant AIs.

## III. Unnamed Co-Conspirators.

21. The following persons, firms, corporations, and/or other distributor and retailer entities not named as Defendants in this Complaint participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' above-described anticompetitive conduct, including entering into the above-described anticompetitive "loyalty programs," including but not limited to: Nutrien Ag Solutions, Helena Agri-Enterprises,

6

GROWMARK, Inc., Wilbur-Ellis Co., CHS, Greenpoint AG, Simplot Grower Solutions, Pinnacle Agriculture Distribution, Ag Tech Services, Inc., and Peterson Seeds, Inc. Defendants are jointly and severally liable for the acts of their co- conspirators, regardless of whether Plaintiff formally names such co-conspirators as Defendants.

22.     Other unknown persons, firms, corporations, and/or other entities not named as Defendants in this Complaint participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' above-described anticompetitive conduct, including entering into the above-described anticompetitive "loyalty programs." Defendants are jointly and severally liable for the acts of their co-conspirators, regardless of whether Plaintiff formally names such co-conspirators as Defendants.

IV.     **Reciprocal agency of Defendants and Unnamed Co-Conspirators.**

23.     Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, and/or representatives while actively engaged in the management, direction, control, and/or transaction of the entity's business and/or affairs.

24.     Each Defendant and co-conspirator acted as the agent or joint venturer of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct Plaintiff alleges.

**INTERSTATE COMMERCE**

25.     The market for CPPs in the United States is a national market.

26.     Defendants Corteva and Syngenta sell their CPPs to distributors, which sell them to retailers, which sell them to farmers in all 50 states.

27.     Defendants' manufacture, distribution, and sale of CPPs involves a continuous and uninterrupted flow of commerce across state lines.

28.     Defendants' anticompetitive actions have had (and continue to have) a substantial

7

effect on interstate trade and commerce in the markets for the CPPs containing the Relevant AIs.

## THE CPP INDUSTRY BACKGROUND

### I.    Introduction.

29.    The CPPs containing the Relevant AIs fall into three categories: herbicides, insecticides, and fungicides.

30.    Herbicides (also known as weedkillers) are chemicals used to control weeds. Selective herbicides control specific weed species, while leaving the desired crop relatively unharmed. Non-selective herbicides (sometimes called total weedkillers in commercial products), on the other hand, are used to clear waste ground as they kill all plant material with which they come into contact.

31.    Insecticides (also known as pesticides) are chemicals used to kill or control various unwanted species of pests that reduce crop yields. Most of the pesticides used in the United States are used by farmers to protect their crops.

32.    Fungicides are biocidal chemical compounds or biological organisms used to kill parasitic fungi or their spores. A fungistatic inhibits their growth. Fungi can cause serious damage in agriculture, resulting in critical losses of yield, quality, and profit. Chemicals used to control oomycetes, which are not fungi, are also referred to as fungicides, as oomycetes use the same mechanisms as fungi to infect plants. Fungicides can either be contact, translaminar, or systemic. Contact fungicides are not taken up into the plant tissue and protect only the plant where the spray is deposited. Translaminar fungicides redistribute the fungicide from the upper, sprayed leaf surface to the lower, unsprayed surface. Systemic fungicides are taken up and redistributed through the xylem vessels. Most fungicides are sold in liquid form.

33.    Weeds compete with crops for water and soil nutrients and sunlight, pests, such as insects or roundworms (known by the scientific name "nematodes"), eat the plants, and the plants

also can be infected by fungi. Any of these crop afflictions can kill or reduce the growth of crops and reduce their yields.

34.     Herbicides, insecticides, and fungicides target these unwanted species to protect crops. Ergo, they are known as "Crop Protection Products" (CPPs).

35.     CPPs contain (i) one or more active ingredients—such as the Relevant AIs—which are the chemical(s) that actually eradicate the targeted weeds, pests, or fungi, and (ii) various inactive ingredients, such as water, surfactants (a chemical that helps a liquid spread more easily to increase its effectiveness), or adjuvants (which slow the drying of a liquid or improve its absorption into plant leaves).

36.     AIs differ from one another in various ways: (i) the type of weeds, pests, and fungi they target, (ii) their effectiveness in eliminating or controlling the targeted weeds, pests, and fungi, (iii) the type of crops for which they are used, (iv) the stage of the growing cycle in which they are used, and (v) how well they function under different climactic and weather conditions.

37.     The way in which a specific AI kills or controls unwanted weeds, pests, or fungi is known as a "mode of action." Different AIs have different modes of action in terms of the chemical and biological reactions they use on the targeted weeds, pests, or fungi. For this reason, a generic version of a brand-name CPP that has the same AIs is normally a suitable substitute for the corresponding brand-name CPP.

38.     The CPPs at issue here are Syngenta's CPPs containing the Relevant AIs MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR and their generic equivalents, and Corteva's CPPs containing the Relevant AIs OXAMYL, RIMSULFURON, and ACETOCHLOR and their generic equivalents.

## II.     CPP Manufacturers.

39.     Companies that manufacture CPPs can either manufacture the AIs internally or buy

9

the AIs from chemical suppliers.

40.     Companies that perform their own research and development of AIs for CPPs are known as basic manufacturers. Basic manufacturers secure patent protection for the AIs they develop.

41.     Defendants Syngenta and Corteva are basic manufacturers, and among the largest CPP manufacturers in the United States.

42.     Generic manufacturers of CPPs typically do not engage in their own research and development of AIs. They primarily sell CPPs using AIs developed by basic manufacturers for which the patent and regulatory protections have expired. There are more than twelve generic manufacturers selling CPPs in the United States.

### III.    Government Regulation of CPPs.

43.     The federal government uses regulation and the patent system to encourage CPP manufacturing in two distinct ways: (i) rewarding basic manufacturers, such as Syngenta and Corteva, for researching and developing new CPP AIs by giving them a period of patent and regulatory exclusivity, and (ii) once the protection periods expire, encouraging generic manufacturers to make much cheaper versions of the CPPs.  This system allows for a period of large profits for basic manufacturers for researching and developing new brand-name CPP AIs that, in turn, encourages continued innovation, but also makes CPPs affordable once the protection periods expire.

44.     Patent protection for a basic manufacturer developing a new CPP AI lasts from the date of issuance of the patent until twenty years after the date of the patent application.

45.     The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) is a federal regulatory scheme that also rewards innovation while guaranteeing the safety of CPPs. To sell or distribute a CPP in the United States, a manufacturer must conduct research about the CPP's

10

toxicity and environmental impact, and then submit that information to the Environmental Protection Agency (EPA), which reviews that information prior to approving that CPP.

46.     When the EPA approves a new CPP AI, the basic manufacturer that applied for approval of the new AI has a ten-year period under which other companies are not allowed to rely on the studies and data it submitted. The effect of this protection is that the basic manufacturer obtaining the approval has a ten-year exclusive period that can (and often does) last after the expiration of the patent.

47.     After both the patent protection and FIFRA ten-year period protection of an AI have expired, a generic manufacturer may secure approval to enter the market by using the same data the basic manufacturer originally submitted. This is a much faster, easier, and cheaper process than a company performing its own research and development.

## IV.     The CPP Distribution Channel.

48.     CPP manufacturers sell their CPPs to distributors.

49.     CPP distributors sell CPPs to farmers through own their own retail outlets and/or sell CPPs to retail chains and independent retailers in farming communities around the country that, in turn, sell the CPPs to farmers.

50.     This "traditional" distribution channel is responsible for approximately 90% of all CPP sales in the United States.

51.     The seven largest U.S. CPP distributors— Nutrien Ag Solutions, Helena Agri-Enterprises, GROWMARK, Inc., Wilbur-Ellis Co., CHS, Pinnacle Agriculture Distribution, and Simplot Grower Solutions—sell approximately 90% of all CPPs sold in the United States through the traditional distribution channel, which equates to about 80% of the total sales of CPPs in the United States annually.

52.     The distributors are by far the best way for a CPP manufacturer to reach their farmer

Case 1:22-cv-01055   Document 1   Filed 12/07/22   Page 11 of 41

target market. A CPP manufacturer only must sell through a few large distributors to access a large percentage of all retail outlets serving most American farmers. The distributors either own their own retail stores or have longstanding relationships with retailers that facilitate their CPP sales. Distributors also have a massive infrastructure to support the distribution and sales of their CPPs, including logistics, storage facilities, financing, and promotions. CPP manufacturers would encounter substantial difficulties and significant costs trying to develop these logistical capabilities on their own; it also would be far less efficient for CPP manufacturers to try to sell CPPs directly to retailers or farmers.

## V.    Generic Entry and Life Cycle Management.

53.    Once the patent and regulatory exclusivity for a basic manufacturer's branded CPP expire, market entry of generic versions of the CPP is normally associated with active competition between many manufacturers, which, in turn, results in far lower prices and vastly reduces the profit the basic manufacturer makes from the CPP.

54.    Basic manufacturers, such as Syngenta and Corteva, engage in corporate strategy planning, known as "life cycle management," for a branded CPP. This can be done in a perfectly legal and pro-competitive manner, such as determining how a CPP's pricing should change, and how much in promotional expenses should be devoted to that CPP, at different points in its exclusivity period. However, it can also involve anticompetitive methods designed to prevent or delay the entry of generic CPPs into the market—which is precisely what happened with the Relevant AIs here.

## DEFENDANTS' ANTITRUST VIOLATIONS

55.    Defendants each use "loyalty programs" with their distributors that are designed to prevent generic competitors from being able to access much of the U.S. CPP market.

56.    Defendants' loyalty programs were established with the intention of maintaining

12

monopolistic or near-monopolistic exclusivity for their CPPs even after the patent and regulatory protection on the CPPs expired.

57. Under their loyalty programs, Defendants make large payments to the co-conspirator distributors and retailers and other distributors and retailers that agreed to strictly limit their purchases of certain generic CPPs that compete with Defendants' CPPs that have lost patent and regulatory protection. These large "bonus" payments were a conduit for Defendants to share monopoly profits with such distributors and retailers to secure their cooperation with the anticompetitive scheme described herein.

58. Defendants' loyalty programs, in fact, have achieved these goals. Generic competition for CPPs containing the Relevant AIs has been greatly inhibited due to Defendants' loyalty programs to get the co-conspirator distributors and retailers to exclude or minimize the distribution and sale of generic versions of such CPPs.

59. Moreover, the small quantities of CPPs containing generic Relevant AIs that are still able to be sold are significantly more expensive because output is significantly restricted and prices are artificially higher as a result—thereby allowing generic manufacturers to price their CPPs significantly higher than they otherwise would have priced them in a free, open, and competitive market across the distribution channel.

I. **Syngenta's Key AI Loyalty Program.**

60. Syngenta's loyalty program is called the "Key AI" program. Both distributors and retailers participate in the Key AI program.

61. The Key AI program is intended to and, in fact, does reduce or exclude generic competition for Syngenta CPPs that have lost patent and regulatory exclusivity.

62. Under the Key AI program, a substantial portion of distributors' and retailers' overall CPP purchases must be Syngenta CPPs that have lost patent and regulatory exclusivity to

13

receive loyalty program payments, thereby severely limiting their purchases of generic versions of such CPPs.

63.     As a result of reducing or excluding generic CPP competition, Syngenta continues to charge high prices for its CPPs and maintain high market share even after the CPPs have lost patent and regulatory exclusivity—thereby allowing Syngenta to earn supra-competitive profits that it would not otherwise receive if there was a free, open, and competitive market across the distribution channel.

64.     Syngenta uses its loyalty program incentive payments to distributors and retailers to encourage their cooperation in this scheme, sharing part of its supra-competitive profits with them in exchange for their role in reducing or excluding generic CPP competition, so Syngenta's supra-competitive profits will continue.

## II.     Corteva's Loyalty Program.

65.     Corteva's loyalty program is intended to and, in fact, does reduce or exclude generic competition for Corteva CPPs that have lost patent and regulatory exclusivity.

66.     Under Corteva's loyalty program, a substantial portion of distributors' and retailers' overall CPP purchases must be Corteva CPPs that have lost patent and regulatory exclusivity to receive loyalty program payments, thereby severely limiting their purchases of generic versions of such CPPs.

67.     As a result of reducing or excluding generic CPP competition, Corteva continues to charge high prices for its CPPs and maintain high market share even after the CPPs have lost patent and regulatory exclusivity—thereby allowing Corteva to earn supra-competitive profits that it would not otherwise receive if there was a free, open, and competitive market across the distribution channel.

68.     Corteva uses its loyalty program incentive payments to distributors and retailers to

14

encourage their cooperation in this scheme, sharing part of its supra-competitive profits with them in exchange for their role in reducing or excluding generic CPP competition, so Corteva's supra-competitive profits will continue.

## III. Market Effects of Loyalty Programs.

69.     Syngenta and Corteva have entered into loyalty program agreements with all major unnamed co-conspirator distributors of CPPs in the United States. Corteva also has entered into loyalty program agreements with major distributors that are also major national retailers of CPPs.

70.     Since the major distributors have such a large market share of the traditional distribution channel, and thereby control a large share of all CPP sales to farmers, Syngenta's and Corteva's loyalty programs substantially impact the U.S. CPP market, significantly restricting competition for the CPPs containing the Relevant AIs, which results in higher CPP prices to farmers and extended increased profits for Syngenta and Corteva.

71.     The fact that the major distributors know their competitors participate in these loyalty programs means that each major distributor knows that no one distributor will leave a loyalty program and sell lower priced generic CPPs because it would undermine the entire scheme and jeopardize the large profits the distributors generate from the loyalty programs.

72.     Since the loyalty programs require the unnamed co-conspirator distributors and retailers to purchase a substantial share of their CPPs containing the Relevant AIs from Syngenta and Corteva or risk losing the incentive payments, there is no incentive for the distributors and retailers to deal with generic CPP competitors at all.

73.     Moreover, the small quantities of CPPs containing generic Relevant AIs that are still able to be sold are significantly more expensive because output is significantly restricted and prices are artificially higher as a result—thereby allowing generic manufacturers to price their CPPs significantly higher than they otherwise would have priced them in a free, open, and competitive

15

market across the distribution channel.

## IV. Syngenta CPPs Subject to the Key AI Loyalty Program.

74. Syngenta's Key AI loyalty program includes CPPs containing three of the Relevant AIs for which patent and regulatory exclusivities have expired: MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR (and s- METOLACHLOR, as explained below).

75. MESOTRIONE is an herbicide that controls common weeds in corn fields.

76. After Syngenta's patent and regulatory exclusivity for MESOTRIONE expired, generic manufacturers introduced generic versions of CPPs containing MESOTRIONE that were priced significantly lower than Syngenta's branded versions.

77. However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing MESOTRIONE despite their products having the same AIs and being much cheaper.

78. To meet the Syngenta loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing MESOTRIONE (or don't purchase generics at all), they don't promote generic CPPs containing MESOTRIONE, and they encourage their customers to buy Syngenta's CPPs containing MESOTRIONE rather than equally effective generic competitors.

79. This has effectively minimized generic competition for Syngenta in the market for CPPs containing MESOTRIONE and caused at least two generic manufacturers to postpone or cancel introducing a MESOTRIONE CPP in the United States.

80. This greatly reduced competition has resulted in much higher profits for Syngenta from sales of brand-name CPPs containing MESOTRIONE than it would have otherwise received in a free, open, and competitive market across the distribution channel.

81. AZOXYSTROBIN is a fungicide used to kill and control fungal diseases on crops.

16

82.     After Syngenta's patent and regulatory exclusivity for AZOXYSTROBIN expired, generic manufacturers introduced generic versions of CPPs containing AZOXYSTROBIN that were priced significantly lower than Syngenta's branded versions.

83.     However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing AZOXYSTROBIN despite their products having the same AIs and being much cheaper.

84.     To meet the Syngenta loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing AZOXYSTROBIN (or don't purchase generics at all), they don't promote generic CPPs containing AZOXYSTROBIN, and they encourage their customers to buy Syngenta's CPPs containing AZOXYSTROBIN rather than equally effective generic competitors.

85.     This has effectively minimized generic competition for Syngenta in the market for CPPs containing AZOXYSTROBIN and caused at least two generic manufacturers to postpone or cancel introducing a AZOXYSTROBIN CPP in the United States.

86.     This greatly reduced competition has resulted in much higher profits for Syngenta from sales of brand-name CPPs containing AZOXYSTROBIN than it would have otherwise received in a free, open, and competitive market across the distribution channel.

87.     METOLACHLOR is an herbicide that controls common weeds in various crop fields, including corn, soybeans, and sorghum.

88.     Products containing METOLACHLOR typically contain a 50-50 mixture of s-METOLACHLOR and r- METOLACHLOR, which have identical molecular makeups but are arranged differently (like a left and right glove). Syngenta's CPPs containing METOLACHLOR, however, are predominantly s-METOLACHLOR (i.e., 88% s-METOLACHLOR and 12% r-

17

METOLACHLOR). CPPs using predominantly s-METOLACHLOR are far more effective at killing weeds than CPPs with the 50-50 METOLACHLOR mix.

89. After Syngenta's patent and regulatory exclusivity for METOLACHLOR expired, generic manufacturers introduced generic versions of CPPs containing METOLACHLOR that were priced significantly lower than Syngenta's branded versions.

90. However, due to Syngenta's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing METOLACHLOR despite their products having the same AIs and being much cheaper.

91. To meet the Syngenta loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing METOLACHLOR (or don't purchase generics at all), they don't promote generic CPPs containing METOLACHLOR, and they encourage their customers to buy Syngenta's CPPs containing METOLACHLOR rather than equally effective generic competitors.

92. This has effectively minimized generic competition for Syngenta in the market for CPPs containing METOLACHLOR and caused at least two generic manufacturers to postpone or cancel introducing a METOLACHLOR CPP in the United States.

93. This greatly reduced competition has resulted in much higher profits for Syngenta from sales of brand-name CPPs containing METOLACHLOR than it would have otherwise received in a free, open, and competitive market across the distribution channel.

94. The unnamed co-conspirator distributors and retailers have received (and continue to receive) loyalty program payments from Syngenta for cooperating with Syngenta's above-described scheme to restrain trade in its Relevant AIs and generated substantial illicit profits doing so.

## V.    Corteva CPPs Subject to Corteva's Loyalty Program.

95.    Corteva's loyalty program includes CPPs containing three of the Relevant AIs for which patent and regulatory exclusivities have expired: OXAMYL, RIMSULFURON, and ACETOCHLOR.

96.    OXAMYL is an insecticide and nematicide used to control pests in various crop fields, including cotton fields and fruit and vegetable fields.

97.    After Corteva's patent and regulatory exclusivity for OXAMYL expired, generic manufacturers introduced generic versions of CPPs containing OXAMYL that were priced significantly lower than Corteva's branded versions.

98.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing OXAMYL despite their products having the same AIs and being much cheaper.

99.    To meet the Corteva loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing OXAMYL (or don't purchase generics at all), they don't promote generic CPPs containing OXAMYL, and they encourage their customers to buy Corteva's CPPs containing OXAMYL rather than equally effective generic competitors.

100.    This has effectively minimized generic competition for Corteva in the market for CPPs containing OXAMYL and caused at least two generic manufacturers to postpone or cancel introducing an OXAMYL CPP in the United States.

101.    This greatly reduced competition has resulted in much higher profits for Corteva from sales of brand-name CPPs containing OXAMYL than it would have otherwise received in a free, open, and competitive market across the distribution channel.

102.    RIMSULFURON is an herbicide used to hinder weed growth in various crop fields.

19

103. After Corteva's patent and regulatory exclusivity for RIMSULFURON expired, generic manufacturers introduced generic versions of CPPs containing RIMSULFURON that were priced significantly lower than Corteva's branded versions.

104. However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing RIMSULFURON despite their products having the same AIs and being much cheaper.

105. To meet the Corteva loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing RIMSULFURON (or don't purchase generics at all), they don't promote generic CPPs containing RIMSULFURON, and they encourage their customers to buy Corteva's CPPs containing RIMSULFURON rather than equally effective generic competitors.

106. This has effectively minimized generic competition for Corteva in the market for CPPs containing RIMSULFURON and caused at least two generic manufacturers to postpone or cancel introducing a RIMSULFURON CPP in the United States.

107. This greatly reduced competition has resulted in much higher profits for Corteva from sales of brand-name CPPs containing RIMSULFURON than it would have otherwise received in a free, open, and competitive market across the distribution channel.

108. ACETOCHLOR is an herbicide that inhibits weed growth in corn, soybean, and sugar beet fields.

109. Corteva and Bayer are joint venture partners that own the U.S. registration for ACETOCHLOR. Bayer manufactures the ACETOCHLOR and Corteva sells CPPs containing ACETOCHLOR covered by the Corteva loyalty program

110. After Corteva's patent and regulatory exclusivity for ACETOCHLOR expired,

20

generic manufacturers introduced generic versions of CPPs containing ACETOCHLOR that were priced significantly lower than Corteva's branded versions.

111.    However, due to Corteva's loyalty program, the generic manufacturers are not able to gain any significant market share in the market for generic CPPs containing ACETOCHLOR despite their products having the same AIs and being much cheaper.

112.    To meet the Corteva loyalty program's share requirement and continue to receive large incentive payments, distributors and retailers strictly limit purchases of generic CPPs containing ACETOCHLOR (or don't purchase generics at all), they don't promote generic CPPs containing ACETOCHLOR, and they encourage their customers to buy Corteva's CPPs containing ACETOCHLOR rather than equally effective generic competitors.

113.    This has effectively minimized generic competition for Corteva in the market for CPPs containing ACETOCHLOR and caused at least two generic manufacturers to postpone or cancel introducing an ACETOCHLOR CPP in the United States.

114.    This greatly reduced competition has resulted in much higher profits for Corteva from sales of brand-name CPPs containing ACETOCHLOR than it would have otherwise received in a free, open, and competitive market across the distribution channel.

115.    The unnamed co-conspirator distributors and retailers have received (and continue to receive) loyalty program payments from Corteva for cooperating with Corteva's above-described scheme to restrain trade in its Relevant AIs and generated substantial illicit profits doing so.

## RELEVANT MARKETS

116.    At all relevant times, Syngenta had (and has) market and monopoly power with respect to CPPs containing AZOXYSTROBIN, MESOTRIONE, METOLACHLOR, and s-METOLACHLOR.  Syngenta had (and has) the power to maintain the prices of CPPs containing these Relevant AIs at supra-competitive levels without losing substantial sales to other CPPs used

21

for the same purposes.

117.    At all relevant times, Corteva had (and has) market and monopoly power in the markets for CPPs containing OXAMYL and RIMSULFURON, and had (and has) market power with respect to CPPs containing ACETOCHLOR. Corteva had (and has) the power to maintain the prices of CPPs containing these Relevant AIs at supra-competitive levels without losing substantial sales to other CPPs used for the same purposes.

118.    To the extent Plaintiff's claims require the definition of a relevant market, it is the market for EPA-registered CPPs for sale in the United States containing the Relevant AIs, as follows:

a.    F o r  the Relevant AI AZOXYSTROBIN, the relevant market is the market for EPA-registered CPPs for sale in the United States containing AZOXYSTROBIN, including Syngenta's CPPs containing AZOXYSTROBIN and any generic versions of such CPPs;

b.    F o r  the Relevant AI MESOTRIONE, the relevant market is the market for EPA-registered CPPs for sale in the United States containing MESOTRIONE, including Syngenta's CPPs containing MESOTRIONE and any generic versions of such CPPs;

c.    F o r  the Relevant AI METOLACHLOR, the relevant market is the market for EPA-registered CPPs for sale in the United States containing METOLACHLOR, including Syngenta's CPPs containing METOLACHLOR and any generic versions of such CPPs; and

d.    F o r  the Relevant AI s- METOLACHLOR, the relevant market is the market for EPA-registered CPPs for sale in the United States containing s- METOLACHLOR,

including Syngenta's CPPs containing s- METOLACHLOR and any generic versions of such CPPs.

e. For the Relevant AI OXAMYL, the relevant market is the market for EPA-registered CPPs for sale in the United States containing OXAMYL, including Corteva's CPPs containing OXAMYL and any generic versions of such CPPs;

f. For the Relevant AI RIMSULFURON, the relevant market is the market for EPA-registered CPPs for sale in the United States containing RIMSULFURON, including Corteva's CPPs containing s RIMSULFURON and any generic versions of such CPPs; and

g. For the Relevant AI s ACETOCHLOR, the relevant market is the market for EPA-registered CPPs for sale in the United States containing ACETOCHLOR, including Corteva's CPPs containing ACETOCHLOR and any generic versions of such CPPs;

119. To the extent Plaintiff's claims require the definition of a relevant geographic market, it the United States. The EPA must approve CPPs for sale and use in the United States. Farmers in the United States are not allowed to legally use CPPs from other countries that have not been approved for sale and use in the United States. Thus, the price of CPPs in other countries does not affect the market for CPPs in the United States.

120. Defendants dominate the markets for CPPs containing the Relevant AIs despite the fact that such CPPs do not currently possess patent and regulatory exclusivities. There are significant barriers prohibiting generic manufacturers from entering the market for any CPP containing the Relevant AIs, including patent and regulatory barriers, EPA registration, access to supplies of active and inactive ingredients, manufacturing facilities and know-how, and the ability

23

to distribute CPPs effectively. Defendants' wrongful actions also created barriers to entry for generic manufacturers of CPPs containing the Relevant AIs that prevent them from accessing the traditional distribution channels and competing effectively in such markets.

121. For each CPP containing a Relevant AI, its only reasonable substitute is a generic version of the CPP containing a generic version of the Relevant AI. Other CPPs with different AIs will attack different types of weeds or pests, be suitable for different climate and weather conditions or types of crops, and/or have different modes of action in terms of the chemical and biological reactions used to target particular weeds or pests and, therefore, would obtain different results than a CPP containing a Relevant AI.

122. MESOTRIONE is differentiated from other CPP AIs used for similar purposes due to its greater efficacy and crop safety and lower use rate than other CPPs.

123. AZOXYSTROBIN is differentiated from other CPP AIs used for similar purposes because it can be used with all major row crops, making application easier. It also is claimed to have growth-promoting effects on crops.

124. METOLACHLOR is differentiated from other CPP AIs used for similar purposes due to its greater solubility in water (which improves its performance in drier conditions), better performance in warmer conditions, and ability to be used in a wider variety of crop fields. S-METOLACHLOR has the same advantages of METOLACHLOR but with an even greater efficacy in killing weeds.

125. OXAMYL is differentiated from other CPP AIs used for similar purposes because it has less risk to crops and/or soil health, and can be applied directly onto crops instead of applied at root level or in the soil.

126. RIMSULFURON is differentiated from other CPP AIs used for similar purposes

because it affects more different types of weeds, it can be used with a wider variety of crop fields, and it can be used preemptively to prevent weed growth as well controlling an existing weed problem.

127.     ACETOCHLOR is differentiated from other CPP AIs used for similar purposes due to its superior performance in wetter or cooler conditions, its greater efficacy against particular types of weeds, and its greater efficacy earlier in the growing season.

128.     A small but significant and non-transitory artificial inflation of the price of any CPPs containing the Relevant AIs would not cause a significant number of consumers to purchase CPPs with different AIs so as to make such price inflation unprofitable. A small but significant and non-transitory artificial inflation of the price of any CPPs with different AIs than the Relevant AIs would not cause a significant number of farmers to purchase CPPs containing the Relevant AIs instead so as to make such artificial price inflation unprofitable.

## EFFECTS OF DEFENDANTS' ANTITRUST VIOLATIONS

129.     Syngenta's and Corteva's CPP loyalty programs, with cooperation and assistance of the unnamed co-conspirator distributors and retailers, were intended to and, in fact, did exclude and/or reduce generic competition for the manufacture and sale of CPPs containing the Relevant Ais in the United States.

130.     As such, Plaintiff and Class members paid (and continue to pay) more for brand-name CPPs containing the Relevant AIs, as well as their generic CPP competitors, than what they would have paid in a free, open, and competitive market across the distribution channel.  Plaintiff and Class members have sustained (and continue to sustain) substantial losses and damage to their businesses and property in the form of the overcharges on such purchases of CPPs containing the Relevant AIs, as well as their generic CPP competitors.  The types and amounts of their antitrust damages will be determined after discovery and upon proof at trial. Plaintiff's and Class members'

Case 1:22-cv-01055   Document 1   Filed 12/07/22   Page 25 of 41

antitrust damages, injury, and harm, which are the foreseeable, direct, an/or proximate result of Defendants' anticompetitive conduct are ongoing.

## CLASS ACTION ALLEGATIONS

131. Pursuant to FED. R. CIV. P. 23, Plaintiff brings this action against Defendants as a class action, for itself and all members of the following class of similarly situated individuals and entities (the "Class Members"):

> All persons or entities in the United States that purchased crop protection products ("CPPs") containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, s-METOLACHLOR, OXAMYL, RIMSULFURON, or ACETOCHLOR directly from a co-conspirator distributor or retailer that participated in the Syngenta and/or Corteva CPP loyalty programs, from as early as January 1, 2017, to the present (the "Class Period").

132. Excluded from the Class are (i) Defendants and their subsidiaries, affiliates, directors, officers, and employees, and (ii) all state and federal government entities and agencies, including the Court and Court personnel.

133. Hundreds of thousands of persons and entities geographically dispersed across the United States purchased CPPs containing the Relevant AIs, as well as their generic competing CPPs, directly from a co-conspirator distributor or retailer that participated in the Syngenta and/or Corteva CPP loyalty programs during the Class Period. Accordingly, the Class members are so numerous that joinder of them in one action is impracticable.

134. By their above-described anticompetitive conduct and wrongful actions, Defendants and their unnamed co-conspirator distributors and retailers violated the rights of Plaintiff and each Class Member in the same way by overcharging for CPPs containing the Relevant AIs, as well as their generic competing CPPs, that, in turn, resulted in the infliction of antitrust injury, harm, and damages on Plaintiff's and Class Members' businesses and property.

135. Certain questions of law and fact common to the proposed Class predominate over

any questions affecting individual Class Members, including, *inter alia*:

(i) Whether Syngenta had anticompetitive monopoly power in the markets for CPPs containing MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR by means of its CPP loyalty program?

(ii) Whether Syngenta's CPP loyalty program was intended to and/or did, in fact, exclude or reduce generic competition for CPPs containing MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR?

(iii) Whether Syngenta and its co-conspirator distributors and retailers conspired to restrain trade in the markets for CPPs containing MESOTRIONE, AZOXYSTROBIN, and METOLACHLOR?

(iv) Whether Corteva had anticompetitive monopoly power in the markets for CPPs containing OXAMYL, RIMSULFURON, and/or ACETOCHLOR by means of its CPP loyalty program?

(v) Whether Corteva's CPP loyalty program was intended to and/or did, in fact, exclude or reduce generic competition for CPPs containing OXAMYL, RIMSULFURON, and ACETOCHLOR?

(vi) Whether Corteva and its co-conspirator distributors and retailers conspired to restrain trade in the markets for CPPs containing OXAMYL, RIMSULFURON, and/or ACETOCHLOR?

(vii) Whether Syngenta's alleged anticompetitive conduct violated (and continues to violate) Section 1 of the Sherman Act, 15 U.S.C. § 1?

(viii) Whether Corteva's alleged anticompetitive conduct violated (and continues to violate) Section 1 of the Sherman Act, 15 U.S.C. § 1?

(ix) Whether the co-conspirator distributors' and retailers' alleged anticompetitive conduct violated (and continues to violate) Section 1 of the Sherman Act, 15 U.S.C. § 1?

(x) Whether Syngenta's alleged anticompetitive conduct violated (and continues to violate) Section 2 of the Sherman Act, 15 U.S.C. § 2?

(xi) Whether Corteva's alleged anticompetitive conduct violated (and continues to violate) Section 2 of the Sherman Act, 15 U.S.C. § 2?

(xii) Whether the co-conspirator distributors' and retailers' alleged anticompetitive conduct violated (and continues to violate) Section 2 of the Sherman Act, 15 U.S.C. § 2?

(xiii) Whether Syngenta's alleged anticompetitive conduct was (and continues to be) an unreasonable restraint of trade?

(xiv)    Whether Corteva's alleged anticompetitive conduct was (and continues to be) an unreasonable restraint of trade?

(xv)     Whether the co-conspirator distributors' and retailers' alleged anticompetitive conduct was (and continues to be) an unreasonable restraint of trade?

(xvi)    Whether Syngenta's, Corteva's, and their co-conspirator distributors' and retailers' alleged anticompetitive conduct directly and/or proximately caused Plaintiff's and Class Members antitrust injury, harm, and damages to their businesses and property?

(xvii)   Whether Plaintiff's and Class members are entitled to injunctive and/or equitable relief and, if so, the form of such relief?

(xviii)  Whether Syngenta, Corteva, and/or their co-conspirator distributors and retailers fraudulently concealed their alleged anticompetitive conduct?

(xix)    Whether Plaintiff and Class members could reasonably have known about Syngenta's, Corteva's, and their co-conspirator distributors' and retailers' alleged anticompetitive conduct prior to the Federal Trade Commission filing its complaint in September 2022?

136.    Plaintiff's claims are typical of Class Members' claims because Plaintiff and Class Members are all victims of the same above-described anticompetitive schemes involving CPPs containing the Relevant AIs perpetrated on them by Syngenta, Corteva, and their co-conspirator distributors and retailers.

137.    Plaintiff and its counsel will fairly and adequately represent the interests of Class Members. Plaintiff has no interests antagonistic to, or in conflict with, the interests of any Class Members. Plaintiff's counsel are experienced in leading and prosecuting large multi-district antitrust class actions, and do not anticipate any difficulties in managing this action as a class action.

138.    A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiff's and Class Members' claims. Plaintiff and Class Members have been (and will continue to be) harmed, injured, and damaged as a direct and/or proximate result of Syngenta's, Corteva's, and their co-conspirator distributors' and retailers' alleged anticompetitive

conduct. Litigating this case as a class action is appropriate because (i) it will avoid a multiplicity of suits and the corresponding burden on the courts and Parties, (ii) it would be virtually impossible for all Class Members to intervene as individual parties-plaintiff in this action, and (iii) it will provide court oversight of the claims process once Defendants' liability is adjudicated.

139.    Certification, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above-described common questions of law or fact predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

140.    Certification also is appropriate under FED. R. CIV. P. 23(b)(2) because Defendants and their co-conspirator distributors and retailers have acted (or refused to act) on grounds generally applicable to the Class, thereby making equitable relief appropriate for the Class as a whole.

141.    Certification also is appropriate under FED. R. CIV. P. 23(b)(1) because the prosecution of separate actions by individual Class Members would create a risk of establishing incompatible standards of conduct for Defendants and their co-conspirator distributors and retailers. For example, individual actions could be dispositive of the interests of other Class Members who are not parties to such actions, and substantially impair or impede their ability to protect their interests.

142.    Syngenta's, Corteva's, and their co-conspirator distributors' and retailers' alleged anticompetitive conduct are applicable to the Class as a whole, for which Plaintiff seeks, *inter alia*, damages and other equitable remedies.

143.    Absent a class action, Syngenta, Corteva, and their co-conspirator distributors and retailers will retain the benefits of their wrongdoing despite seriously violating the law and inflicting

29

actual and consequential antitrust injury, harm, and damages on Plaintiff and Class Members and their property and businesses.

**DEFENDANTS' FRAUDULENT CONCEALMENT OF THE CPP LOYALTY PROGRAM SCHEME AND CONSPIRACY**

144. Defendants and their co-conspirator distributors and retailers effectively, affirmatively, and fraudulently concealed their CPP loyalty program scheme and conspiracy from Plaintiff and Class members. Plaintiff and Class members do not specialize in the manufacturing, marketing, and sales of CPPs, but rather, they are farmers. Along with hundreds of other agricultural products, they simply purchase CPPs from Defendants and their co-conspirator distributors and retailers and apply them to their crops and fields.

145. Defendants and their co-conspirator distributors and retailers used various means and methods to fraudulently conceal their CPP loyalty program scheme and conspiracy from Plaintiff and Class members, including, without limitation, (i) entering into private CPP loyalty program agreements that were not publicly disclosed to Plaintiff and Class members or disclosed in legally mandated public disclosure documents, such as Syngenta's and Corteva's SEC filings, (ii) secret meetings, (iii) surreptitious communications between Defendants and their co-conspirator distributors and retailers by telephone or in person meetings to prevent the existence of written records, and (iv) statements to Plaintiff and Class members designed to deceive Plaintiff about the real factors involved in the prices that Plaintiff paid for CPPs containing the Relevant AIs, as well as their generic CPP counterparts.

146. Defendants and their co-conspirator distributors and retailers engaged in secret behavior intended to advance their CPP loyalty program scheme and scheme and conspiracy for the purpose of reaping substantially higher profits on such CPPs over an extended time period than they otherwise would have generated in a free, open, and competitive market. Defendants'

Case 1:22-cv-01055   Document 1   Filed 12/07/22   Page 30 of 41

and their co-conspirator distributors' and retailers' CPP loyalty program scheme and scheme and conspiracy—based on behavior known only by them to be illegal at the time they engaged in such behavior—plausibly suggest they engaged in a campaign of fraudulent concealment.

147. In addition to Defendants and their co-conspirator distributors and retailers affirmatively concealing their CPP loyalty program scheme and conspiracy, the conspiracy was inherently self-concealing because it depended on secrecy for its successful operation.

148. Until the Federal Trade Commission ("FTC") and various states filed their complaint in federal court in the Middle District of North Carolina on September 29, 2022 (the "FTC Complaint"), Plaintiff and Class members had neither actual, nor constructive, knowledge of the facts constituting their claims for relief as stated in this Complaint. Plaintiff and Class members did not discover, and could not have discovered, through the exercise of reasonable diligence, the existence of the CPP loyalty program scheme and conspiracy alleged herein until the FTC filed its complaint. Until then, Defendants and their co-conspirator distributors and retailers engaged in their secret CPP loyalty program scheme and conspiracy that did not reveal facts that would put Plaintiff and Class members on inquiry notice that that such a scheme and conspiracy existed. Throughout the Relevant Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful CPP loyalty program scheme and conspiracy from Plaintiff and Class members.

149. Plaintiff and Class members also lacked the facts and information necessary to form a good faith basis for believing that any legal violations had occurred. Reasonable diligence by Plaintiff and Class members would not have uncovered those facts more than four years before the filing of this Complaint.

150. All applicable statutes of limitations affecting Plaintiff's and Class members'

claims, therefore, have been tolled. As such, Plaintiff and Class members are entitled to recover damages reaching back beyond four years of the filing of this Complaint.

<u>**DEFENDANTS' ONGOING AND CONTINUING ANTITRUST VIOLATIONS**</u>

151.    A continuing violation operates in two ways: (i) it restarts the statute of limitations period each time Defendants commit an overt act, and (ii) it occurs where, as here, Defendants' and their co-conspirator distributors' and retailers' anticompetitive conduct causes a continuing harm to Plaintiff and Class members.

I.    **Defendants and their Co-Conspirator Distributors and Retailers Renewed their CPP Loyalty Program Scheme and Conspiracy with New and Independent Acts.**

152.    From the start of their CPP loyalty program scheme and conspiracy, at least as early as the beginning of 2017, and continuing through the effects of the CPP loyalty program scheme and conspiracy, Defendants or their co-conspirators sold CPPs containing the Relevant AIs, as well as their generic CPP competitors, to purchasers, such as Plaintiff and Class members, at artificially high prices resulting from Defendants' and their co-conspirator distributors' and retailers' CPP loyalty program agreements. A cause of action accrued for Plaintiff and Class members each time they bought CPPs containing the AIs CPPs or their generic CPP competitors covered by Defendants' and their co-conspirators' loyalty program agreements at supra-competitive prices, which constituted another overt act in furtherance of their anticompetitive CPP loyalty program scheme and conspiracy. Accordingly, even though certain of the loyalty program agreements were entered into more than four years prior to the filing of this Complaint, Plaintiff and Class members are entitled to recover damages on all their purchases at supra-competitive prices of CPPs containing the Relevant AIs, as well as their generic CPP competitors, within, at the very least, four years of the filing of this Complaint.

153.    Defendants' and their co-conspirator distributors' and retailers' conspiratorial

32

meetings, communications, and nondisclosures were among the overt acts that commenced running a new statute of limitations because such meetings, communications, and nondisclosures advanced the objectives of their CPP loyalty program scheme and conspiracy. Defendants and their co-conspirator distributors and retailers also committed new overt acts each time they took actions to implement their CPP loyalty program scheme and conspiracy, such as by entering into loyalty program agreements and selling CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiff and Class members at supra-competitive prices.

154. Each sale of CPPs containing the Relevant AIs, as well as their generic CPP competitors, by Defendants and/or their co-conspirator distributors and retailers to Plaintiff and Class members at a supra-competitive price also was a new overt act and antitrust violation injuring Plaintiff and Class members that started the statutory period running again.

155. Defendants' and their co-conspirator distributors' and retailers' overt acts, including, without limitation, those mentioned above, were new and independent acts that perpetuated their loyalty program agreements; they were not merely reaffirmations of Defendants' and their co-conspirator distributors' and retailers' previous acts. By constantly selling CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiff and Class members at supra-competitive prices Defendants and their co-conspirator distributors and retailers inflicted new and accumulating injury, harm, and damages on Plaintiff's and Class members' businesses and property.

## II. Defendants and Their Co-conspirator Distributors and Retailers Inflicted New and Accumulating Injury on Plaintiff and Class Members.

156. Plaintiff and Class members purchased CPPs containing the Relevant AIs, as well as their generic CPP competitors from Defendants and their co-conspirators, from the beginning

33

of the CPP loyalty program scheme and conspiracy until the present and will continue to do so in the future.

157. Each such purchase by Plaintiff and Class members from Defendants and their co-conspirators at a price that was higher, or will be higher in the future, resulting from Defendants' and their co-conspirators' CPP loyalty program scheme and conspiracy necessarily caused Plaintiff to suffer new and accumulating injury, harm, and damages.

158. As the concept of a continuing violation applies to a scheme and conspiracy that brings about a series of unlawfully high-priced sales over several years, each sale of CPPs containing the Relevant AIs, as well as their generic CPP competitors to Plaintiff and Class members by Defendants or their co-conspirators starts the statutory period running again, regardless of Plaintiff's and/or Class members' knowledge about the unlawful CPP loyalty program scheme and conspiracy at an earlier time. This means that each illegally priced direct sale of CPPs containing the Relevant AIs, as well as their generic CPP competitors, to Plaintiff and Class members by Defendants or their co-conspirators created a new cause of action for purposes of the statute of limitations.

159. Defendants' and their co-conspirators' CPP loyalty program scheme and conspiracy continued into the period four years before the FTC Complaint was filed, and into the period four years before the filing of the first direct purchaser class action complaint.

160. Defendants and their co-conspirator distributors and retailers constantly coordinated and communicated with each other beginning in 2017 and through the present. Including in this manner, Defendants' and their co-conspirator distributors' and retailers' CPP loyalty program scheme and conspiracy continued when their CPP sales to Plaintiff and Class members were made during the period four years preceding the filing of the FTC Complaint, and

during the period four years preceding the filing of the first direct purchaser class action complaint.

161. Defendants' and their co-conspirator distributors' and retailers' CPP loyalty program scheme and conspiracy were intended to and, in fact, did inflict continuing injury, harm, and damages on Plaintiff's and Class members businesses and property.

## CLAIMS AND CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF § 1 OF THE SHERMAN ACT (15 U.S.C. § 1)
### (Against All Defendants)

162. The preceding factual statements and allegations are incorporated by reference.

163. Defendants Corteva and Syngenta violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by entering into unlawful loyalty program agreements with their co-conspirator distributor and retailers that were intended to and did, in fact, restrain generic competition in the markets for CPPs containing the Relevant AIs.

164. Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, injured, harmed, and damaged Plaintiff and Class members in their businesses or property. Plaintiff's and Class members' damages consist of paying higher prices for CPPs containing the Relevant AIs and their generic competitor CPPs than they otherwise would have paid in a free, open, and competitive market across the distribution channels. Such injury, harm, and damages, also known as "overcharges," are of the type that the antitrust laws are designed to prevent, and it flows from Defendants' alleged anticompetitive and unlawful conduct.

165. At all relevant times, Defendants possessed market power in the relevant markets for each of the CPPs containing the Relevant AIs. But for Defendants' and their co-conspirators' wrongful conduct, as alleged herein, genuine competition from generic manufacturers for each of such CPPs would have greatly reduced retail prices at all points across the distribution channel, including the prices paid by Plaintiff and Class members.

35

166.     Defendants entered into the CPP loyalty program agreements with their co-conspirator distributors and retailers under which Defendants made large payments to their co-conspirators in exchange for such distributors and retailers minimizing their purchases and sales of generic CPP competitors of the brand-name CPPs containing the Relevant AIs manufactured by Defendants. Defendants entered into the CPP loyalty program agreements to and, in fact, did unreasonably restrain trade in the markets for such CPPs, the purpose and effect of which was to: (i) prevent generic competitors for the CPPs containing the Relevant AIs from accessing large parts of the market, and (ii) allow their own name-brand CPPs containing the Relevant AIs to be sold at significantly higher prices and still maintain most of the market, thereby artificially increasing the prices that Plaintiff and Class members paid for such CPPs. Defendants also used the loyalty programs to divert a portion of their supra-competitive profits from their scheme and conspiracy to their co-conspirator distributors and retailers to secure their cooperation with the scheme.

167.     There is and was no legitimate, non-pretextual, pro-competitive business justification for Defendants' anticompetitive conduct that outweighs its harmful effect on CPP purchasers and competition. Defendants' conduct can only be explained by anticompetitive motives and a desire to foreclose competition in the markets for CPPs containing the Relevant AIs. Even if there were some conceivable and cognizable justification, Defendants' CPP loyalty program agreements were not necessary to achieve such a purpose. Any supposed procompetitive benefits are false and pretextual and/or could have been achieved in a less restrictive manner.

168.     Moreover, the small quantities of the generic competitor CPPs that are still sold are significantly more expensive because output in their markets is significantly restricted, thereby empowering generic manufacturers to price such generic CPPs significantly higher than they

would be prices in a free, open, and competitive market across the distribution channel.

169.     As a direct and/or proximate result of Defendants' and their co-conspirator distributors' and retailers' anticompetitive conduct involving the CPP loyalty program agreements, Plaintiff and Class members have been (and will continue to be) harmed.

170.     As a direct, material, and/or proximate result of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Plaintiff and Class members have suffered (and will continue to suffer) injury and harm to their business or property within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a). As such, Plaintiff and Class members are entitled to treble damages for Defendants' violations of Section 1 of the Sherman Antitrust Act, under Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

171.     Defendants' unlawful anticompetitive conduct continues and, unless restrained, will  continue. Unless and until their wrongful conduct is enjoined, Plaintiff and Class members will continue to suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiff and Class members, therefore, are also entitled to an injunction against Defendants preventing and restraining further antitrust violations, under Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT TWO
## VIOLATION OF § 2 OF THE SHERMAN ACT (15 U.S.C. § 2) – MONOPOLIZATION
### (Against Syngenta)

172.     The preceding factual statements and allegations are incorporated by reference.

173.     The relevant product markets are the markets for EPA-registered CPPs containing MESOTRIONE, AZOXYSTROBIN, METOLACHLOR, and s-METOLACHLOR. The relevant geographic market is the United States.

174.     As a result of the scheme alleged herein, Syngenta possesses monopoly power in each of these markets.

Case 1:22-cv-01055   Document 1   Filed 12/07/22   Page 37 of 41

175.     By means of the CPP loyalty program scheme and conspiracy, under which it made large payments to its co-conspirator distributors and retailers for their above-described cooperation, Syngenta willfully maintained its monopoly power in such markets even after its patent and regulatory exclusivities expired.

176.     Syngenta's actions were carried out willfully and with the specific intent to maintain its monopoly power in such CPP markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

177.     The direct, foreseeable, and proximate result of Syngenta's anticompetitive conduct was increased prices and harm to competition in such CPP markets.

178.     There is no legitimate pro-competitive justification for Syngenta's anticompetitive conduct, and even if there were, there are less restrictive alternatives to achieve them.

179.     As a direct, material, and proximate result of Syngenta's violation of § 2 of the Sherman Act, Plaintiff and Class members have suffered (and will continue to suffer) injury and harm to their business and property within the meaning of § 4 of the Clayton Act. As such, Plaintiff and Class members are entitled to treble damages for Syngenta's violations of § 2 of the Sherman Act under § 4 of the Clayton Act.

180.     Syngenta's unlawful anticompetitive conduct continues and, unless restrained, will continue. Unless and until its wrongful conduct is enjoined, Plaintiff and Class members will continue to suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiff and Class members, therefore, are also entitled to an injunction against Corteva preventing and restraining further antitrust violations, under § 16 of the Clayton Act.

## COUNT THREE
## VIOLATION OF § 2 OF THE SHERMAN ACT (15 U.S.C. § 2) – MONOPOLIZATION
### (Against Corteva)

181.     The preceding factual statements and allegations are incorporated by reference.

182.    The relevant product markets are the markets for EPA-registered CPPs containing RIMSULFURON and OXAMYL. The relevant geographic market is the United States.

183.    As a direct and/or proximate result of the alleged CPP loyalty program scheme and conspiracy, Corteva possesses monopoly power in the markets for EPP-registered CPPs containing RIMSULFURON and OXAMYL for sale in the United States.

184.    By means of the CPP loyalty program scheme and conspiracy, under which it made large payments to its co-conspirator distributors and retailers for their above-described cooperation, Corteva willfully maintained its monopoly power in such markets even after its patent and regulatory exclusivities expired.

185.    Corteva's actions were carried out willfully and with the specific intent to maintain its monopoly power in such CPP markets through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

186.    The direct, foreseeable, and proximate result of Corteva's anticompetitive conduct was increased prices and harm to competition in such CPP markets.

187.    There is no legitimate pro-competitive justification for Corteva's anticompetitive conduct, and even if there were, there are less restrictive alternatives to achieve them.

188.    As a direct, material, and proximate result of Corteva's violation of § 2 of the Sherman Act, Plaintiff and Class members have suffered (and will continue to suffer) injury and harm to their business and property within the meaning of § 4 of the Clayton Act. As such, Plaintiff and Class members are entitled to treble damages for Corteva's violations of § 2 of the Sherman Act under § 4 of the Clayton Act.

189.    Corteva's unlawful anticompetitive conduct continues and, unless restrained, will  continue. Unless and until its wrongful conduct is enjoined, Plaintiff and Class members will

39

continue to suffer immediate and irreparable injury for which they are without an adequate remedy at law. Plaintiff and Class members, therefore, are also entitled to an injunction against Corteva preventing and restraining further antitrust violations, under § 16 of the Clayton Act.

## RELIEF REQUESTED

**WHERFORE,** Plaintiff respectfully requests the Court to certify this action as a class action, appoint it as a class representative, and appoint its counsel as Class counsel. Plaintiff further requests that Defendants be cited to appear and answer this action, and, upon final trial or hearing, judgment be entered that the above-described CPP loyalty program scheme and conspiracy, and the above-described wrongful and anticompetitive acts engaged in by Defendants and their co-conspirators in furtherance thereof, violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1; 2, and further, judgment be entered, favor of Plaintiff and Class Members, and against Defendants, as follows:

(i)     that Plaintiff and Class members have been (and continue to be) injured in their businesses and property as a direct and/or proximate result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(ii)    that Plaintiff and Class members have been (and continue to be) injured in their businesses and property as a direct and/or proximate result of Defendants' violations of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(iii)   three times their actual damages resulting from Defendants' violations of the Sherman Act;

(iv)    permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

(v)     their attorneys' fees, litigation expenses, and court costs through the trial and any appeals of this action;

(vi)    pre-judgment and post-judgment interest at the highest lawful rate; and

(vii)   such other and further relief to which Plaintiff and Class members are justly entitled.

## JURY TRIAL DEMANDED

Pursuant to FED. R. CIV. P. 38(b), Plaintiff demands a trial by jury of all issues so triable.

Date: December 7th, 2022

By: */s/ Kevin G. Williams*
Kevin G. Williams, N.C. State Bar No. 25760
Alan M. Ruley, N.C. State Bar No. 16407
**BELL, DAVIS & PITT, P.A.**
P.O. Box 21029
Winston-Salem, North Carolina 27120-1029
T: (336) 722-3700
kwilliams@belldavispitt.com
aruley@belldavispitt.com

**KAPLAN FOX & KILSHEIMER, LLP**
Robert N. Kaplan
Matthew P. McCahill
850 Third Avenue, 14th Floor
New York, New York 10022
T: (212) 687-1980
rkaplan@kaplanfox.com
mmccahill@kaplanfox.com

***Counsel for Plaintiff and the Putative Class***

41